## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Thomas W. Butts, Jr., <u>et al.</u>,      )
                                      )
                Plaintiffs,    ) Case No. 1:11-CV-918
                                        )
     vs.                             )
                                        )
OMG, Inc., <u>et al.</u>,              )
                                        )
                Defendants.   )

## O R D E R

      This matter is before the Court on motions for summary judgment filed by Defendants Elastomeric Roofing Systems, Inc., Albion Engineering, Inc., OMG Roofing, Inc., and OMG, Inc. (Doc. Nos. 52, 54, 59) and motions in limine filed by Defendants Elastomeric Roofing Systems, Inc. , OMG Roofing, Inc., and OMG, Inc., (Doc. Nos. 53, 56, 58).  For the reasons that follow, Defendants' motions for summary judgment are well-taken and are **GRANTED**.  Defendants' motions in limine are **MOOT**.

## I. <u>Background</u>

      Plaintiff Thomas Butts presents Ohio statutory products liability claims for defective design and defective warnings against Defendants Elastomeric Roofing Systems, Inc. ("ERS"), Albion Engineering, Inc. ("Albion"), OMG Roofing, Inc. and OMG, Inc. (collectively "OMG") arising out of injuries he sustained using the SpotShot Manual Stand-up Applicator ("SpotShot Applicator") and OlyBond 500 SpotShot Adhesive ("OlyBond 500").   Additionally, Plaintiff originally asserted

statutory manufacturing defect claims against the Defendants but he has now abandoned those claims at the summary judgment stage of the case. Plaintiff's wife and minor children present derivative loss of consortium claims against the Defendants. The Court has subject matter jurisdiction in this case because there is diversity of citizenship between Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000. See Doc. Nos. 96, 97, 98, 100 (amended complaint and answers curing defective jurisdictional allegations).

## A. The SpotShot Applicator and OlyBond 500

The SpotShot Applicator and OlyBond 500 together comprise a system for use in the commercial roofing industry to adhere insulation board to roofing substrates. Doc. No. 79 (proposed findings of fact) ¶¶ 2, 8.

The SpotShot Applicator is essentially a large caulking gun. OlyBond 500 is a two-part adhesive that is packaged in a twin cartridge. Within the twin cartridge, Part 1 and Part 2 of the adhesive are contained in their own individual cylinder. Squeezing the trigger on the SpotShot Applicator advances a set of pistons attached to the transfer bar. The end of each piston attaches to a plunger situated at the bottom of the cylinders for Part 1 and Part 2. The plungers then dispense Part 1 and Part 2 into a mixing nozzle located at the top of the twin cartridge in a one-to-one ratio. As the two parts advance through the mixing nozzle, they combine and react to form the adhesive that bonds the insulation board to the roofing substrate. A photograph of an exemplar of the SpotShot Applicator and the OlyBond 500 cartridge is attached to this order as Exhibit 3.

2

OMG sells the SpotShot Applicator and OlyBond 500 together as a private-label product. Albion designed and manufactures the SpotShot Applicator to OMG's specifications. ERS designed and manufactures the OlyBond 500 adhesive itself, but other entities, not parties to this lawsuit, designed and manufacture the twin cartridge and mixing nozzle. ERS, however, does fill the twin cartridge with the two parts of the adhesive, packages the cartridges, along with the mixing nozzle, four to a box, and sells them to OMG exclusively for distribution.

### B. The Accident

Plaintiff Thomas Butts was employed as a roofer by Dalton Roofing Company. On the afternoon of June 30, 2010, Plaintiff was using the SpotShot Applicator and OlyBond 500 to secure insulation board to the roof deck on a project then underway in Cincinnati.

According to his deposition testimony, Plaintiff had dispensed about half the contents of a twin cartridge when a co-worker asked him for help to retrieve more roofing boards. Plaintiff pressed the release button on the applicator handle and manually retracted the pistons from the cartridge. Plaintiff did not recall specifically how far he retracted the pistons, but testified that "standard like on any other caulking gun that I've ever used I always – I pull it out maybe an inch." Plaint. Dep. (Doc. No. 71), at 78-79; 169-70. Plaintiff then placed the applicator down with the nozzle facing upwardly at an angle so that the adhesive would not drip onto the roof deck. Id. at 75-76.

Plaintiff was away from the applicator assisting his co-workers for no more

3

than five minutes. Id. at 85-86. When he returned to resume dispensing adhesive, Plaintiff reset the plungers into the cartridge and pulled the trigger on the applicator once. When he pulled the trigger, Plaintiff felt pressure and nothing came out of the mixing nozzle. This indicated to Plaintiff that the cartridge and/or mixing nozzle was "frozen." Id. at 89. When the nozzle became clogged up, the only thing to do was replace the old twin cartridge and the old mixing nozzle with new ones. Id. at 86-87.

Resting the applicator against his leg and with the trigger handle near his shoulder, Plaintiff pressed the release button on the handle with his right hand. Pressing the release button allowed Plaintiff to retract the pistons and remove the twin cartridge. At this time, however, his left hand was apparently dangling in the vicinity of the horizontal cross-frame of the applicator. Plaintiff testified that when he pressed the release button he heard a loud explosion - "like a 12 gauge shotgun going off" - and suddenly realized that his left ring finger and left middle finger were trapped between the transfer bar and the cross-frame of the applicator. Id. at 91-95.

Plaintiff's fingers were severely crushed between the transfer bar and the cross-frame of the applicator. After several unsuccessful surgeries to repair his fingers, Plaintiff ultimately had to have the tip of his ring finger amputated and most of his middle finger amputated. McGee Dep. (Doc. No. 94), at 40.

OMG has sold the equivalent of 100 million square feet of OlyBond 500 without any prior reports of an explosive blowback such as the one that occurred

4

to Plaintiff. Leonard Dep. (Doc. No. 73) at 69; Choiniere Dep. (Doc. No. 55-2, at 77); Doc. No. 52-2, at 6-7 (Defendant ERS's Responses to Plaintiff's Interrogatories). Plaintiff had dispensed approximately 1,000 cartridges of OlyBond 500 in the two months prior to his accident without any problems. Plaint. Dep. at 58; 162-63.

### C. Plaintiff's Theory of the Case and Test Results

Plaintiff theorizes that this incident was caused by an explosive blowback resulting from gaseous pressure that had built up within the OlyBond 500 twin cartridge. Plaintiff posits two somewhat similar scenarios which he contends would have created an explosive blowback. Under one scenario, Plaintiff theorizes that when he turned the applicator upwardly, Parts 1 and 2 of the adhesive flowed back into the cartridge and reacted together within one or both of the cylinders, creating a pressure build-up within the cartridge. Under the other scenario, Plaintiff theorizes that the pistons of the applicator did not advance the plungers uniformly through the twin cartridge. As a result of the unequal or uneven advancement of the plungers, Part 1 of the adhesive was able to cross-flow into the cylinder for Part 2, or vice versa. Part 1 and Part 2 then chemically reacted to create a pressure build-up within the cartridge. Under both scenarios, however, the pressure within the cartridge could not be relieved through the mixing nozzle because it was clogged by hardened or cured adhesive. Instead, the pressure within the cartridge was suddenly and explosively released when Plaintiff pressed the release button on the handle of the applicator. Plaintiff retained two experts, Rickey Stansifer and Rob Evans, to test his theories.

5

## 1. Stansifer's Tests and Opinions

Stansifer conducted four experiments with an exemplar SpotShot Applicator. In each experiment, Stansifer emptied about half of the contents of a twin cartridge before testing a particular scenario. Additionally, in each test, Stansifer connected force transducers between the pistons and the plungers to measure pressure build-up within the cartridge. Stansifer, however, was not able to create a blowback event in any of his tests. Stansifer Dep. (Doc. No. 69) at 61, 78, 239.

In the first test, conducted at an ambient temperature of 78 degrees Fahrenheit, Stansifer laid the applicator on its side and measured the force for 15 minutes. Stansifer observed that contents of the cartridge continued to emerge through the nozzle but slowed gradually over the 15 minutes. The force in the cylinder for Part 1 peaked at 27 pounds at 15 minutes. The force in the cylinder for Part 2 peaked at 39 pounds at 15 minutes. After 20 minutes, Stansifer pressed the release valve and removed the cartridge. Doc. No. 53-4, at 14.

In the second test, Stansifer placed a 1/4 inch spacer in the cylinder for Part 1 and advanced the pistons by a 1/4 inch. The purpose of adding a spacer was to create a cross-flow of material and force Part 1 into the cylinder of Part 2. Stansifer Dep. at 63-66. Stansifer then laid the applicator on its side and measured the forces for 15 minutes. The force in the cylinder for Part 1 rose to 10 pounds after 15 minutes. The force in the cylinder for Part 2 rose to 11 pounds after 15 minutes. Doc. No.53-4, at 14. Material was still oozing from the tip of the nozzle after 15 minutes. Stansifer pressed the release button of the applicator at the end of 15

6

minutes without a blowback, then removed and discarded the cartridge. Stansifer Dep. at 68-69.

In the third test, Stansifer placed a 1/4 inch spacer in the cylinder for Part 2 and advanced the pistons the same 1/4 inch. This test was the inverse of the second test and was intended to create a cross-flow of material of Part 2 into the cylinder for Part 1. Stansifer Dep. at 69. The force in Part 1 rose to 26 pounds after 15 minutes. The force in Part 2 rose to 20 pounds after 15 minutes. Material oozed from the tip of the nozzle throughout the test. Doc. No. 53-4, at 14. This test did not produce a blowback event; Stansifer was able to press the release valve and remove the cartridge without incident. Stansifer Dep. at 70.

Stansifer performed the fourth test at an ambient temperature of 95 degrees Fahrenheit. This time, he placed a ½ inch spacer in the cylinder for Part 2 and advanced the piston half an inch. Doc. No. 53-4, at 14. Again, Stansifer did this to force Part 2 into the cylinder for Part 1. Additionally, Stansifer mechanically plugged the mixing nozzle by screwing a bolt into the open tip. Stansifer Dep. at 73-74. During this test, the force in Part 1 rose to 140 pounds within 40 seconds. The force in Part 2 rose to 148 pounds, then dropped and stabilized at 90 pounds for four minutes, and then spiked to 118 pounds. At that point, the rear seal on the plunger of Part 1 failed and the contents exited through the top of the cylinder. Doc. No. 53-4, at 14. As was the case with the other tests, the fourth test did not produce a blowback of the transfer bar.

7

Despite the fact that none of his tests generated a blowback of the transfer bar, Stansifer opined that Plaintiff was injured when a sudden release of energy propelled the transfer bar upwardly, crushing his fingers between the cross-frame of the applicator. Doc. No. 53-4, at 4. Stansifer indicated in his deposition that his opinion was validated because his tests showed that the applicator system generates force and retains pressure - "the ingredients it takes to ram the bar back." Stansifer Dep. at 85. Stansifer also testified that no other theory, such as gravity or magnetism, would have caused the transfer bar to blow back as it apparently did. Id. at 84.

Stansifer opined that the SpotShot Applicator was defectively designed in that it should have included a shield over the open area where the pistons and transfer bar travel in order to protect the operator from the pinch point where Plaintiff's fingers were injured. Stansifer's firm, in fact, designed and installed a lightweight metal shield that did not interfere with the operation of the applicator. Doc. No. 53-4, at 4; Stansifer Dep. at 106-08.

Stansifer also opined that the OlyBond 500 was defective because the twin cartridge did not employ a backflow preventer to stop the two parts from flowing back into the cylinders. Stansifer, however, did not design or test a backflow preventer that could be used with the OlyBond twin cartridge. Stansifer Dep. at 181-84. On the other hand, an engineer employed by OMG, Peter Shadwell, did install and test a cartridge with a backflow preventer. Shadwell found that a backflow preventer inhibits a uniform mix of the two parts and doubles the force

8

required to expel the product, making the applicator much more difficult for a roofer to operate. Shadwell Dep. (Doc. No. 55-7), at 39-40 (testifying that with a backflow preventer, a roofer would have to "have the forearms of Popeye").

Finally, Stansifer opined that the warnings and instructions for the SpotShot Applicator and OlyBond 500 were inadequate because they failed to warn the user of the potential for a sudden release of energy if the operating rods are not manually released and the cartridge removed if the application process is stopped for more than 30 seconds. Doc. No. 53-5, at 8; Stansifer Dep. at 124-26.

## 2. Evans's Tests and Opinions

Evans conducted five experiments specifically designed to create a blowback event with the SpotShot Applicator and OlyBond 500. Evans Dep. (Doc. No. 72) at 236. Evans also measured the force generated by attaching transducers to the pistons of the applicator. Doc. No. 56-4, at 5.

The first test was an experiment to clog the mixing nozzle. Evans set an environmental chamber to 100 degrees Fahrenheit. He then dispensed a small amount of adhesive and placed the applicator in the chamber at a 30 degree up angle. After 10 minutes, Evans observed that the tip appeared to be clogged. After 15 minutes, loads of 36 and 58 pounds were recorded. Evans then removed the applicator from the oven and removed the mixing nozzle. There was solid material in the tip but it was not very dense. There was also reacted product at the entry of the cartridge, which Evans removed. Evans then emptied about half of the contents of the twin cartridge with the applicator. Evans then emptied about 10 milliliters of

material from Part 2 so that the tubes were uneven. Evans reinstalled the mixing nozzle and pulled the actuating trigger. Evans found that "significant force on the plungers did not develop" but that there was reacted product in both tubes. <u>Id.</u> at 6.

Evans used a new OlyBond 500 cartridge in the second test. He again emptied about half the contents of the twin cartridge. Evans then emptied about 50 milliliters more material from Part 1. This left the cylinders uneven and with an air gap on one side. Evans installed the mixing tip he used in the first test, which leaked significantly after squeezing the trigger a few times. Evans then replaced the mixing tip from the first test with a <u>different style mixing tip that was already clogged from a different application</u>. Force on the plungers increased with the second mixing tip installed. Evans allowed the applicator to rest at a 45 degree upward angle. After 15 to 20 minutes, pressure in the cylinders increased significantly and increased slightly thereafter. <u>After 74 minutes</u>, the loads on the two cylinders were 417 and 362 pounds, or an average internal pressure of 55 psi. <u>At that point</u>, Evans actuated the release mechanism which in turn produced a rapid blowback of the plunger and a loud noise. <u>Id.</u>

Evans used another new OlyBond 500 cartridge for the third test. This time he dispensed about half the contents of the cartridge without the mixing nozzle attached. When that was done, Evans reattached the mixing nozzle and dispensed a small amount of adhesive from the applicator. To prevent the nozzle from continuing to leak, Evans placed a paper towel and plastic bag snugly over the tip.

Continuing on, Evans removed the tip, emptied about 10 milliliters of material from each cylinder and then replaced the tip. Evans then flipped the applicator over and back several times in 90 second intervals. Each time Evans flipped the applicator, he squeezed the trigger a few times. Evans found that within 15 to 20 minutes, significant force had built up on the plungers. After 110 minutes, the forces on the plungers were 322 and 338 pounds, or an average internal pressure of 47 psi. Evans actuated the release mechanism at this point, apparently squeezing the trigger at the same time. Evans observed that the plungers shot back only a short distance. Evans theorized that the blowback was less severe during this test because it was stopped or slowed by the trigger. Doc. No. 56-4, at 7.

The fourth test also involved a new OlyBond 500 cartridge. Evans again dispensed about half of the contents of the cartridge without the mixing nozzle attached. Evans heated the cartridge to approximately 100 degrees Fahrenheit, attached a new mixing tip, and then dispensed a small amount of adhesive. Evans then clamped the end of the nozzle with a quick clamp, squeezed the trigger a few times, and then placed the applicator in chamber at 100 degrees at a 45 degree upward angle. After 62 minutes, the forces on the plungers were 189 and 198 pounds. The pressure started to drop thereafter, however, because there was a leak at the end of the tip. Doc. No. 56-4, at 7.

In the fifth test, also with a new cartridge, Evans dispensed about half of the contents of the cartridge without the mixing nozzle attached. He then heated the cartridge to 100 degrees Fahrenheit. Evans poured out about 25 milliliters of

material from both cylinders and then injected 10 milliliters of material from each tube into the opposite tube. Evans then took the clogged mixing tip from the fourth test and attached a C clamp to the end. After pulling the trigger several times, the whole apparatus was then placed back into the heating chamber at a 45 degree upward angle. After 26 minutes, the loads on the plungers were 280 and 293 pounds. After 38 minutes, the loads decreased slightly and produced pressure of 41 psi. At that point, Evans actuated the release mechanism and observed a blowback which propelled the transfer bar back to the frame of the applicator. Doc. No. 56-4, at 8.

Like Stansifer, Evans opined that Plaintiff was injured as a result of a dangerous pressure build-up within the OlyBond 500 cartridge, caused by material flowing backwardly and reacting within the cylinders, that was suddenly released when Plaintiff actuated the release mechanism. Id. at 3-4. Evans's written report (Doc. No. 56-4) does not provide any opinions as to whether the SpotShot Applicator and OlyBond 500 were defectively designed or whether there were inadequate instructions and warnings for these products. In his deposition, however, Evans testified that a guard and a backflow preventer would have prevented Plaintiff's injury. Evans Dep. at 66. Like Stansifer, however, Evans did not develop or test a backflow preventer in the twin cartridge. Id. at 66-67. Evans also stated that pinch points on the applicator should have been identified with warnings placed on the tool itself. Id. at 73.

12

Finally, Evans conceded in his deposition that none of his experiments achieved a blowback event in conditions that approximated a roofer's normal use of the applicator and adhesive. Id. at 222, 229-34.

### D. OMG's Tests

As indicated above, an engineer hired by OMG, Peter Shadwell, also conducted back-pressure tests of the SpotShot Applicator and OlyBond 500 after Plaintiff's accident that were not, however, generated in response to Plaintiff's accident. Shadwell Dep. (Doc. No. 55-7), at 19-20. Interestingly, in Shadwell's experiment simulating use of the applicator in sunlight conditions, although he too observed material flow back into and react within the cartridge when the applicator was placed at a 45 degree upward angle, the mixing tip did not clog. Rather, the two parts reacted and expanded so quickly within the cartridge that material flowed back out at the end of the mixing nozzle, which he identified as the path of least resistence. Id. at 51-53. Additionally, as already mentioned, Shadwell's tests showed that a backflow preventer reduced pressure within the cartridge by preventing the two parts from mixing within the canister but at the cost of doubling the force required to expel the adhesive as well as degrading the ability of the two parts to mix efficiently. None of Shadwell's tests produced a blowback event despite exploring a number of clogging and mixing scenarios that were substantially similar to the tests conducted by Plaintiff's experts. Shadwell Dep. at 66, 76-80, 90-94, 96-97, 99-100, 108-10.

13

## E. Procedural Posture of Case

As stated, Plaintiff asserts Ohio statutory defective design and defective and/or inadequate warnings claims against each of the Defendants. Plaintiff has abandoned his claims for defective manufacturing. Plaintiff's wife and children assert derivative loss of consortium claims against the Defendants.

Following the close of discovery, Defendants each filed motions for summary judgment on Plaintiff's claims. Additionally, Defendants each filed motions in limine to exclude the causation opinions of Plaintiff's experts, Stansifer and Evans. Defendants contend that the causation opinions of these experts are not reliable and should be excluded from consideration pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

As explained further below, the Court finds that Plaintiff has failed to create any triable issue of fact as to whether the SpotShot Applicator and OlyBond 500 were defectively designed or had inadequate or defective warnings. Consequently, Defendants are entitled to summary judgment on Plaintiff's statutory products liability claims. The derivative loss of consortium claims necessarily fail as well. The Court, therefore, need not reach the merits of Defendants' motions in limine.

## II. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a disputed fact must be supported by citations to particular parts of the record, including depositions,

affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . or is not

significantly probative, . . . the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

### III. <u>Analysis</u>

As an initial matter, the Court notes that the parties wrangle over a key factual issue concerning Plaintiff's actions leading up to the accident. This factual issue, in turn, affects the question of causation of the accident. Specifically, Defendants argue that the evidence shows that Plaintiff retracted the plungers of the applicator before setting it aside. Plaintiff on the other hand contends that he only testified that he normally retracted the plungers before setting aside the applicator but that he did not testify that he actually retracted the plungers on the applicator on this particular occasion.

This question affects causation because according to at least two of the witnesses, Shadwell and Evans, retracting the plungers releases the pressure in the canister, which, as a consequence, would not permit an explosive blowback of the transfer bar. Shadwell Dep. at 103-04; Evans Dep. at 173-75. According to Defendants, therefore, Plaintiff's causation theory fails because the energy required to create a blowback could not have built up in the canisters after he retracted the plungers. Stansifer, Plaintiff's other expert, testified that a user of the applicator would have to pull the plungers back to their full extent to resolve the problem of an energy build-up in the canisters. Stansifer Dep. at 124-25, 185-87. Stansifer concluded that there still could have been a pressure build-up because

Plaintiff did not indicate to him that he retracted the plungers all the way. Id. at 186-87.

In the Court's view, the record is clear that Plaintiff testified that he did pull the plungers from the canister before he set the applicator aside. See infra at 3. What Plaintiff was unsure about was how far he pulled the plungers back. He did testify, however, that he normally pulls the plungers back about an inch - "standard like on any other caulking gun that I've ever used I always[.]" Id. Plaintiff's testimony is sufficient to establish that in this case he pulled the plungers back about an inch before setting aside the applicator. See Fed. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.). Consequently, Defendants are arguably entitled to summary judgment on Plaintiff's claims solely on the issue of causation because the expert witnesses generally agree that releasing the plungers from the canister prevents an explosive pressure build-up. See Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 532 (6th Cir. 2012) (stating that for a products liability claim to withstand summary judgment the plaintiff must demonstrate "that the allegedly defective condition was the most probable cause of [his] injuries or losses").

As explained further below, however, Defendants would still be entitled to summary judgment on Plaintiff's claims, even giving him the benefit of what likely are unwarranted evidentiary inferences, i.e., that he did not retract the plungers before the accident and/or that he did not retract the plungers a sufficient distance

17

to relieve the pressure from the canister. This holds true even accepting that Daubert does not preclude the admissibility of the opinions of Plaintiff's experts.

## A. Ohio Products Liability Act - Defective Design

Plaintiff claims that the SpotShot Applicator was defectively designed because it did not include a shield to protect users from the pinch point created by the cross-frame of the applicator and the transfer bar. Plaintiff also claims that the OlyBond 500 was defective because the twin cartridge did not include a backflow preventer to stop a pressure build-up caused by Parts 1 and 2 of the adhesive from flowing back into and reacting within the canister

Under Ohio law, "a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation . . . exceeded the benefits associated with that design or formulation[.]" Ohio Rev. Code § 2307.75(A). Subsection B of § 2370.75 sets out a non-exclusive list of factors to consider in assessing the foreseeable risks of a design:

> (1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
>
> (2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;
>
> (3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
>
> (4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer;

18

(5) The extent to which that design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

Ohio Rev. Code § 2307.75(B). "Foreseeable risk" means:

a risk of harm that satisfies both of the following:

(a) It is associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question.

(b) It is a risk that the manufacturer in question should recognize while exercising both of the following:

(i) The attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess;

(ii) Any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question possesses.

Ohio Rev. Code § 2307.71(A)(6).

Subsection C of § 2307.75 has a non-exclusive list of factors to consider in assessing the benefits of a design:

(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;

(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(3) The nature and magnitude of any foreseeable risks associated with an alternative design or formulation.

Ohio Rev. Code § 2307.75(D). If the plaintiff fails to demonstrate a material issue of fact whether the foreseeable risks of a design outweigh the benefits of a design, the defendant will be entitled to summary judgment on a defective design claim. Monroe v. Novartis Pharm. Corp., ___ F. Supp. 2d___, Case No. No. 1:12–cv–00746 (WOB–KLL), 2014 WL 3378345, at *7 (S.D. Ohio July 10, 2014).

A manufacturer of a product, however, is not an insurer of that product. Sutowski v. Eli Lilly & Co., 696 N.E.2d 187, 190 (Ohio 1998); see also Menifee v. Ohio Welding Prod., Inc., 472 N.E.2d 707, 708 syl. (Ohio 1984)("[A] manufacturer need not . . . guarantee that the product is incapable of causing injury in all of its possible uses."). Moreover, a product is not defectively designed solely on the grounds that plaintiff was unexpectedly injured using it. Pruitt v. General Motors Corp., 599 N.E.2d 723, 726 (Ohio Ct. App. 1991).

In this case, Defendants argue that Plaintiff has not adduced sufficient facts from which a reasonable juror could find that the risks of the design of the SpotShot Applicator and OlyBond 500 outweigh the benefits of their designs. Defendants point out that Plaintiff has addressed only the consumer expectations factor of a defective design claim (§ 2307.75(B)(5)) and has completely foregone any analysis of the other factors set out in Subsections B and C. The Court agrees.

Initially, the Court concurs that the consumer expectations factor favors Plaintiff. A reasonably prudent consumer would not expect to suffer a crushing hand or finger injury, such as sustained by Plaintiff in this case, caused by a blowback explosion using products like the SpotShot Applicator and OlyBond 500. The SpotShot Applicator is essentially an oversized caulking gun and common experience teaches that people generally do not suffer traumatic hand injuries using a caulking gun. Compare to Hickey v. Otis Elevator Co., 840 N.E.2d 637, 640 (Ohio Ct. App. 2005)(plaintiff satisfied consumer expectations test where he received an electric shock simply by pushing an elevator button).

20

Although the consumer expectations factor favors Plaintiff, the remaining factors in Subsections B and C either favor Defendants, are neutral, or have no applicability. In particular, however, the evidentiary record shows that an explosive blowback was not a reasonably foreseeable risk of using the SpotShot Applicator and OlyBond 500 adhesive.

As summarized above by the Court, one of Plaintiff's experts, Stansifer, and OMG's engineer, Shadwell, were never able to produce an explosive blowback of the system despite creating conditions that were specifically intended to create a pressure build-up within the twin cartridge. Evans, Plaintiff's other expert, did create a blowback in two of his tests, but only under extreme conditions that were not only completely unlike the conditions prevailing leading up to Plaintiff's accident, they were completely unlike the conditions reasonably likely to prevail during any roofer's normal usage of the applicator and adhesive. In particular, Evans allowed the pressure to build up in the canisters for a substantially longer time than would reasonably be likely to occur during normal use of the system. Additionally, in one test, Evans used a different style mixing nozzle that was not intended for use in the SpotShot Applicator and that was clogged by a substance other than OlyBond 500.

In other words, rather than demonstrating the dangers of using the SpotShot Applicator and OlyBond 500 system, the various tests showed the exact opposite - these products are safe under normal usage conditions. This conclusion is reinforced by the fact that Plaintiff is apparently the only person who has been

seriously injured using this system despite the millions of square feet of OlyBond 500 that has been sold and dispensed. Thus, the record shows that the "nature and magnitude of the risk of harm" (§ 2307.75(B)(1)) and "the likelihood that the design or formulation would cause harm in light of the intended and reasonably foreseeable uses" (§ 2307.75(B)(3)) of the system are quite low. See, e.g., Ogden v. Raymond Corp., No. 95CA0001, 1995 WL 760392, at *2 (Ohio Ct. App. Dec. 27,1995)(stating that "[r]eports of prior incidents caused by an alleged defective design of a product can be instrumental in establishing the 'nature and magnitude of the risks of harm associated with that design.'"). Indeed, the record establishes that the foreseeable risk of harm under normal usage conditions is negligible. Similarly, the unforeseeability of a blowback event under normal usage conditions suggests that both the manufacturers and users of the product were unaware of a risk of harm presented by these products. Ohio Rev. Code § 2307.75(B)(3). Finally, the record contains no evidence of private or public design standards in effect concerning either caulking guns, adhesives, or the canisters containing the adhesives. Ohio Rev. Code. § 2307.75(B)(3). To summarize then, the balance of the § 2307.75(B) factors indicate that there was not a foreseeable risk of a blowback event with the design of the SpotShot Applicator and OlyBond 500 at the time of Plaintiff's accident.

The Court proceeds to consider the benefits of the design of the SpotShot Applicator and OlyBond 500. First, although Plaintiff contends that the OlyBond 500 should have included a backflow preventer to prevent Parts 1 and 2 from mixing and

reacting within the canister, neither he nor his experts have designed or tested a backflow preventer that would work in this system. Generally, the plaintiff's failure to develop and test an alternative design is fatal to a defective design claim. See Jacobs v. E.I. du Pont de Nemours & Co., 67 F.3d 1219, 1242 (6th Cir. 1995) (plaintiff bears the burden of producing evidence of a technically feasible alternative design that would have avoided the harm and that does not impair the usefulness of the product). On the other hand, OMG presented evidence that a backflow preventer does impair the usefulness of the device - it makes it much more difficult to dispense the adhesive and it inhibits an efficient mixing of the two parts. Consequently, the record shows that, as to the adhesive and/or the twin cartridge, the current design has performance advantages over a system that includes a backflow preventer. Ohio Rev. Code § 2307.75(C)(1).

Second, Plaintiff has presented evidence that a shield or guard over the open space where the transfer bar and pistons travel was feasible, would have prevented his accident, and does not impair the efficient use of the applicator and adhesive. This evidence would seemingly favor Plaintiff's contention that the SpotShot Applicator was defectively designed for not including a shield. In the context of the unforeseeability of the risk of a blowback, however, it is not particularity probative of a design defect. The record indicates that the transfer bar advances forward very slowly and in increments of only about .3 millimeters per trigger squeeze. Schneider Dep. (Doc. No. 61), at 27-58. Thus, a shield would not be necessary to protect a user against a forward pinch point. And, as already discussed, an

23

explosive blowback of the transfer bar was not a reasonably foreseeable risk of using the applicator. In other words, prior to Plaintiff's accident, there was nothing to reasonably indicate a risk of harm created by pinch points of the applicator. Moreover, there is evidence in the record that the forward handle of the applicator Plaintiff used was installed incorrectly. Id. at 20-25. The picture of the exemplar applicator (Attached Exhibit 3) indicates that correctly installed, the forward handle would ordinarily keep the user's hand clear of the pinch points. This is another reason why it would have been reasonable not to design a shield for the applicator. See id. at 27-28.

Third, while there would not appear to be any increased risk of harm from installing either a backflow preventer in the cartridge or a shield on the applicator, Plaintiff has not identified any record evidence to support the Court's assumption.

In summary of the § 2307.75(C) factors, Plaintiff has not adduced evidence that there was a safe alternative design that does not impair the usefulness of the applicator and adhesive. As discussed, the record shows that a backflow preventer makes it substantially more difficult to dispense the adhesive and it interferes with the efficient mixing of the two parts. A shield over the open area of the pistons and travel bar would have been feasible, but it was reasonable for Defendants not to protect against pinch points in the applicator due to the low risk of harm presented by the forward travel of the transfer bar and the unforeseeability of an explosive blowback of the transfer bar. Moreover, the forward handle of the applicator is a reasonable alternative to a shield to protect against the pinch points.

24

In conclusion, Plaintiff has not created a material issue of fact which demonstrates that the foreseeable risks of the SpotShot Applicator and OlyBond 500 outweigh the benefits of the design. Weighing heavily, if not dispositively, in this conclusion is the fact that all of the experiments done by the parties in the case show that under conditions of normal usage, the risk of harm presented by the design of the SpotShot Applicator and OlyBond 500 is negligible. Similarly, the testing shows that the risk of harm presented to Plaintiff by the design of these two products was unforeseeable as a matter of law. Additionally, at the time of Plaintiff's accident, the design of these products had performance advantages over the alternative proposed now by Plaintiff. As discussed, a backflow preventer would have substantially decreased the utility of the device. While a shield would have guarded against pinch points in the applicator, the forward handle, correctly installed, fulfilled the same function. Defendants, therefore, are entitled to summary judgment on Plaintiff's defective design claim.

### B. Ohio Products Liability Act - Defective or Inadequate Warnings

Plaintiff contends that the SpotShot Applicator had defective or inadequate warnings at the time of marketing because it failed to caution users to beware of the pinch point created between the cross-frame of the applicator and the transfer bar. He also contends that the warnings for the OlyBond 500 were defective or inadequate at the time of marketing because they failed to alert users of the possibility of a dangerous blowback if the plunger is not released and the twin cartridge removed when application operations are stopped.

25

Under Ohio law, a product is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of the manufacturer, both of the following apply:

(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

Ohio Rev. Code § 2307.76(A)(1).

In this case, Defendants are entitled to summary judgment on Plaintiff's defective warnings claim for most of the same reasons pertaining to his defective design claim. First, Defendants had no actual knowledge of a risk of harm associated with the SpotShot Applicator and OlyBond 500 because there were no reported prior injuries or incidents caused by blowbacks. Second, it is not reasonable to find that Defendants should have known of a risk associated with products through pre-marketing testing because, as shown in this case, testing would not have been reasonably likely to show that the products presented a risk of harm during intended usage. As discussed, testing showed that a blowback can occur only in extreme situations that are unlikely to exist when the products are used under normal conditions.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's defective warning claim.

26

## Conclusion

For the reasons stated above, Defendants' respective motions for summary judgment on Plaintiff Thomas Butts' statutory products liability claims are well-taken and are **GRANTED**. Consequently, Defendants are entitled to summary judgment on the derivative loss of consortium claims presented by Plaintiff's wife and minor children. <u>Mota v. Gruszczynski</u>, 968 N.E.2d 631, 637 (Ohio Ct. App.2012). The amended complaint is **DISMISSED WITH PREJUDICE.** Defendants' motions in limine are **MOOT.**

**IT IS SO ORDERED**

Date _9/11/14_

_____
Herman J. Weber
Senior United States District Judge